1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4   UNITED STATES OF AMERICA      §     CASE NO. 4:17-CR-651-2
                                  §     HOUSTON, TEXAS
5   VERSUS                        §     TUESDAY,
                                  §     NOVEMBER 28, 2017
6   GIOVANI ALEXANDER ALECIO      §     10:09 A.M. TO 3:45 P.M.

7

                         DETENTION HEARING
8
                 BEFORE THE HONORABLE MARY MILLOY
9                 UNITED STATES MAGISTRATE JUDGE

10

11                        APPEARANCES:

12      FOR PLAINTIFF/DEFENDANT:     SEE NEXT PAGE

13      COURT RECORDER:              G. CLAIR

14      COURT CLERK:                 CINDY JANTOWSKI

15

16  **THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER
    THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED
17  BY COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
    ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND
18  ONE COPY AT THE OFFICIAL RATE.   General Order 94-15, United
    States Court, Southern District of Texas.**
19

20                   TRANSCRIPTION SERVICE BY:

21              JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                    935 ELDRIDGE ROAD, #144
22                   SUGAR LAND, TEXAS 77478
              Tel: 281-277-5325 / Fax: 281-277-0946
23                 www.judicialtranscribers.com

24

        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.

1                          <u>APPEARANCES</u>:

2

3   FOR THE PLAINTIFF:           ADAM L. GOLDMAN, ESQ.
                                 AUSA
4                                1000 LOUISIANA ST., 27TH FL.
                                 HOUSTON, TX  77208
5

6

7   FOR THE DEFENDANT:          DAVID ADLER, ESQ.
                                DAVID ADLER PC
8                               6750 W. LOOP S., STE. 120
                                BELLAIRE, TX  77401
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2

3   WITNESS:            Direct    Cross    Redirect    Recross

4   DINAH MORALES
      By Mr. Goldman     6         .       55,67        .
5     By Mr. Adler       .        19         .         60,69

6   VIVIAN GUERRERO
      By Mr. Goldman    33         .         .           .
7     By Mr. Adler       .        44         .           .

8

9

10  EXHIBITS:                     Marked    Offered    Received

11  (None.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      HOUSTON, TEXAS; TUESDAY, NOVEMBER 28, 2017; 10:09 A.M.

 2           THE COURT:  Mr. Adler, you're here on Mr. Alecio?

 3           MR. ADLER:  Yes, Your Honor.

 4           THE COURT:  Does he need the assistance of an

 5  Interpreter?

 6           MR. ADLER:  He does not, Your Honor.

 7           THE COURT:  Does not?

 8           MR. ADLER:  He does not need an Interpreter.

 9           THE COURT:  Okay, all right.  Is Mr. Alecio in

10  court?

11           MR. ADLER:  He is not.

12           THE COURT:  Bring in Mr. Alecio, please.

13           MR. ADLER:  And, Your Honor, just for what it's

14  worth, I think Mr. Alecio is the only one having the

15  detention hearing in that case, but these lawyers -- there

16  were three on another case so if you want to do me second

17  after them, that's fine with me.  It's up to the Court.

18           THE COURT:  Well then let me do that.  I'm sorry

19  you didn't tell me that before the Marshal went to get

20  Mr. Alecio.

21           All right, thank you.

22        (Recess taken from 10:09 a.m. to 11:21 p.m.)

23           THE COURT:  Would you bring in Giovani Alexander

24  Alecio, please?

25           (Pause in proceedings.)
```

1          THE COURT:  Which counts is Mr. Alecio named?

2  This doesn't tell me.

3          MR. GOLDMAN:  Oh, I'm sorry, Your Honor, I did a

4  cheat sheet for Judge Stacy and for Your Honor's edification

5  it'll be Count 1; it'll be Count 6; it'll be Count 7; it'll

6  be Count 11; it'll be Count 13; it'll be Count 17, Count 22,

7  Count 26, and then Count 30, Your Honor.

8          THE COURT:  All right, thank you.

9      (Pause in proceedings.)

10          THE COURT:  All right, Mr. Alecio, have a seat

11  please.

12          Let me go ahead and do the Arraignment before we

13  go any further because this is very confusing.

14      (The Court confers with staff.)

15          MR. ADLER:  I thought he --

16          THE COURT:  He's already had an Arraignment?

17          MR. ADLER:  I thought he had been.

18          THE COURT:  Oh, okay never mind.

19          MR. ADLER:  I wasn't here, but I thought he was.

20          THE COURT:  All right.  Then have a seat, sir.

21  Sorry, I misunderstood.

22          All right, do you have a witness, Mr. Goldman?

23          MR. GOLDMAN:  Your Honor, we have two witnesses

24  actually for Your Honor.

25          THE COURT:  All right we need to speed this up

1  because Mr. Lake is waiting here for an 11:00 o'clock

2  hearing.  I know you volunteered to, but thank you.

3          MR. ADLER:  I think Mr. Lake's would be quicker,

4  too.

5          THE COURT:  No, that's all right; I need to talk

6  to her.

7          All right, so, Mr. Adler did you get a copy of the

8  pretrial report?

9          MR. ADLER:  Yes, Your Honor.

10          THE COURT:  Anything that you contend is an error

11  of fact?

12          MR. ADLER:  No, Your Honor.

13          THE COURT:  All right, call your first witness,

14  Mr. Goldman.

15          MR. GOLDMAN:  Actually, Your Honor, to try and

16  speed up I'll do the second witness first.

17          THE COURT:  All right.

18          MR. GOLDMAN:  I'll call FBI Agent Dinah Morales.

19          THE COURT:  Ms. Morales, come forward please.

20        (Witness sworn.)

21          THE COURT:  Go ahead, Mr. Goldman.

22          MR. GOLDMAN:  Yes.

23        DIRECT EXAMINATION OF SPECIAL AGENT DINAH MORALES

24        BY MR. GOLDMAN:

25        Q.   Could you please state your name and occupation

1  for the Record?

2      A.   Yes, Dinah Morales, Special Agent with the FBI.

3      Q.   For how long have you been an FBI Special Agent?

4      A.   Since 2003.

5      Q.   And to what division and group are you currently

6  assigned?

7      A.   I'm assigned to the Houston Division, Civil

8  Rights, which includes crimes against children, domestic

9  servitude, civil rights, as well as sex trafficking domestic

10  and international.

11      Q.   Okay, and what are your duties as a member of that

12  group?

13      A.   To investigate laws concerning servitude, sex

14  trafficking, and any crimes against children really.

15      Q.   What sort of training did you receive to become an

16  FBI Special Agent?

17      A.   I went to an academy, five-year -- five-month

18  academy where you get training on interviewing.  You also go

19  through different defense tactics, you go through different

20  types of federal laws.

21           MR. ADLER:  If it helps I'll --

22           THE COURT:  Thank you.

23           MR. ADLER:  -- stipulate that she's got a lot of

24  experience.

25           THE COURT:  All right.

1          MR. GOLDMAN:  I'll move on, Your Honor.

2      BY MR. GOLDMAN:

3      Q.    Agent Morales, are you familiar with an individual

4  known as Giovani Alexander Alecio?

5      A.    I am.

6      Q.    Do you see him in court today?

7      A.    I do.

8      Q.    Could you please identify him by an article of

9  clothing?

10     A.    Yes, he's wearing the blue and orange shoes.

11         MR. GOLDMAN:  Let the Record reflect she's

12 indicated the Defendant, Your Honor.

13         THE COURT:  Any objection for these purposes,

14 Mr. Adler?

15         MR. ADLER:  None, Your Honor.

16         THE COURT:  All right, then the Record will

17 reflect that identification.

18     (Defendant identified.)

19     BY MR. GOLDMAN:

20     Q.    Are you one of the co-case agents on this

21 matter, --

22     A.    Yes.

23     Q.    -- Agent Morales?

24         Okay, and do you know Mr. Alecio through your

25 investigation by any nicknames or has he been identified by

1    any nicknames?

2        A.   Yes, as "Whiteboy."

3        Q.   Okay, are you familiar with an individual that

4    goes by the initials ABP?

5        A.   I am.

6        Q.   Did you interview her yourself?

7        A.   Yes.

8        Q.   Did you also interview her mother?

9        A.   Correct.

10       Q.   Okay.  How was Ms. ABP or the individual known as

11   ABP related to this Defendant?

12       A.   ABP was smuggled into the United States and was

13   working at one of the brothels.  ABP was domestically abused

14   at -- while in Central America so her mother made

15   arrangements.  Her mother who lived here in Houston made

16   arrangements to smuggle her into the United States.

17            MR. ADLER:  Judge, I'm going to object as

18   nonresponsive.  The question was how was this ABP person

19   related to my client.

20            THE COURT:  Sustained.

21            MR. GOLDMAN:  Okay, I think she was just trying to

22   speed things up, Your Honor.

23            THE COURT:  Well this question and answer would

24   do.

25            MR. GOLDMAN:  All right.

1       BY MR. GOLDMAN:

2       Q.   So what is -- what role does ABP play in this

3   case?

4       A.   ABP is someone that was identified as a victim of

5   human sex trafficking from an international site.

6       Q.   Okay.  Did -- and based on your interviews with

7   ABP and her mother and other information, how did ABP first

8   come in -- first get involved with this organization, the

9   overall Defendants charged in this matter?

10      A.   So after she was smuggled into the United States

11  from a brothel that belonging to William Lopez in Mexico,

12  she was brought into the Carriage Way Apartments where

13  different brothels were taking place.  During her time there

14  at the Carriage Way Apartments, she refused to show up at

15  the brothels.  Whiteboy showed up at her home and dragged

16  her out by her hair and he indicated that he was there

17  because Walter -- I'm sorry, William Lopez had sent him to

18  get her because she refused to go to the brothel.

19      Q.   And what was -- so what was his role in the sex

20  trafficking organization regarding ABP?

21      A.   ABP identified him as an enforcer for the brothels

22  that were under the Southwest Cholos and Patty.

23      Q.   How -- now who is Patty --

24           THE COURT:  What -- I'm sorry, what was last word?

25           THE WITNESS:  For AK Patty, which is Maria

1   Angelica Moreno-Reyna.

2            MR. GOLDMAN:  Okay.  So we're going to back --

3            MR. ADLER:  "Patty," I think is the -- is how --

4            THE COURT:  Thank you.

5       BY MR. GOLDMAN:

6       Q.   I will go back a little bit, Agent Morales.  How

7   did this individual ABP first come into contact with the

8   Defendants named herein that you refer to as the Southwest

9   Cholos?

10      A.   So she came into contact with -- through Maria

11  Angelica Reyna-Moreno [sic].  The way it happened was that

12  her son -- Maria's son in Mexico whose name is William Lopez

13  went and picked up ABP from her -- in Central America.

14  William Lopez then took ABP to a brothel located in Cancun,

15  Mexico.

16      Q.   And who controlled that brothel in Cancun?

17      A.   William Lopez.

18      Q.   Okay.  And what -- how did they -- how did ABP's

19  -- how did her whereabouts become known to this organization

20  initially?

21      A.   So initially what happened was that the mother

22  made arrangements to smuggle her into the United States.

23  The mother knew of a lady --

24            THE COURT:  Whose mother?

25            THE WITNESS:  ABP's mother.

1          THE COURT:  Okay.

2          THE WITNESS:  And ABP's mother knew of a lady in

3    the Carriage Way Apartments who would do human smuggling.

4    Through her contact with that lady, she went and identified

5    that lady as Maria Angelica Moreno-Reyna.

6          Q.   And is that the same individual you previously

7    stated was called Patty?

8          A.   Correct.

9          Q.   And is that a co-Defendant in this case?

10         A.   She is.

11         Q.   So after the mother spoke with this individual

12   known as Patty, what happened next?

13         A.   So she made -- Patty made arrangements with her

14   son in Cancun, Mexico to smuggle ABP into the United States.

15         Q.   And when you say "her son," is that William Lopez?

16         A.   Correct.

17         Q.   Is that also a co-Defendant in this case?

18         A.   He is.

19         Q.   Is he still at large?

20         A.   He is.

21         Q.   So after she made these arrangements with William

22   Lopez what happened next?

23         A.   William Lopez took her to the brothel in his house

24   in Cancun, Mexico.  A couple of days later out of nowhere he

25   just started beating on ABP and injected her with morphine

1  is what she described as a drug.

2           MR. ADLER:  I'm sorry, who did you say did that?

3           THE COURT:  William Lopez.

4           THE WITNESS:  William Lopez.

5      BY MR. GOLDMAN:

6      Q.    And this happened in Cancun, Mexico?

7      A.    Correct.

8      Q.    What organization, if any, controlled that

9  brothel?

10     A.    Southwest Cholos.

11     Q.    And based on your investigation, what is the

12 relationship of that brothel to the brothels you previously

13 mentioned here in Houston?

14     A.    So the brothels -- William Lopez also has a -- had

15 a brothel here in Houston, Texas at Carriage Way Apartments.

16 The women that were used in the Cancun, Mexico were rotated

17 into the Houston brothels.  ABP was kept at the Cancun,

18 Mexico Brothel, but three months later she escaped.

19     Q.    Okay, and after she escaped from that brothel,

20 where did she go?

21     A.    She found a phone and telephoned her mother and

22 told her what had happened.  Her mother then made

23 arrangements to try to bring her into the United States.

24 Raul Moreno-Reyna smuggled her, ABP, into the United States,

25 but --

1    Q.   Is that a co-Defendant in this case as well?

2    A.   Yes.

3    Q.   Okay, and was he successful in bringing her into

4    the United States?

5    A.   No.  Once she crossed the river she was

6    apprehended by Immigration.

7    Q.   Okay, and when she was apprehended by Immigration,

8    was she ever released from Immigration custody on bond?

9    A.   Yes.

10   Q.   And who paid for that bond, if you know?

11   A.   Yes, her mother.

12   Q.   And after she was released where did she go to

13   live?

14   A.   With her mother.

15   Q.   Okay, now at this time what did -- when you --

16   based on your conversations with ABP and her mother, did

17   they believe that the rest of this organization or

18   individuals were involved with the beatings that William

19   caused or did they understand that to be William and William

20   alone?

21   A.   She thought it was just William Lopez.

22   Q.   Okay, so when she went to live with her mother at

23   the -- in Houston, what happened next?

24   A.   Shortly after arriving and living with her mother,

25   three individuals arrived at ABP's mother's home and knocked

DINAH MORALES - DIRECT BY MR. GOLDMAN

1    at the door.  It was Maria Angelica Moreno-Reyna, it was

2    Eddie Alejandro Torres, and -- excuse me, AK Christian,

3    which is one of Torres's women.

4        Q.    And when you say one of his women, do you mean one

5    of the women he prostitutes out?

6        A.    Yes, but he's also -- that's also -- he claims her

7    as his spouse.

8        Q.    Okay, and is Eddie Alejandro Torres also a

9    co-Defendant in this matter?

10       A.    Yes.

11       Q.    So when they approached ABP what happened next?

12       A.    On the phone that Maria Angelica Moreno-Reyna was

13   carrying was the voice of what ABP identified as William

14   Lopez threatening her and very upset because she had

15   escaped.  On top -- because she had escaped, she was going

16   to pay a penalty -- an additional penalty to the smuggling

17   that cost for them to smuggle her into the United States.

18   To pay that penalty she was going to be working at the

19   brothel there at Carriage Way Apartments.  So she was going

20   to start to work the next day.

21       Q.    And did she, in fact, start working there at the

22   brothel?

23       A.    She did.

24       Q.    And did she indicate that there was some sort of

25   force of fear put in her to make her work there?

DINAH MORALES - DIRECT BY MR. GOLDMAN

1    A.   Yes, during the conversation on the telephone with

2   William Lopez, he kept all her identification from her

3   native country and in that was the address and she had five

4   siblings in Central America.  The siblings all were minors

5   except for one female adult who was taking care of them.

6   He threatened -- William Lopez threatened ABP with killing

7   and harming her brothers and sisters if she did not pay the

8   debt by staying at the brothel.

9    Q.   Now did she ever attempt to not work at the

10   brothel?

11    A.   Yes.

12    MR. ADLER:  Judge, could I object?  We've been at

13   this for about ten minutes now and we've had very little

14   reference to my client.  Not just because we're running late

15   today, but I would ask that the Government get to the meat

16   of the case against my client.

17    THE COURT:  Okay, -- well I think there was an

18   overview and we're getting to that, right?

19    MR. GOLDMAN:  That is correct, Your Honor.

20    THE COURT:  Okay, well let's get to that.

21    MR. GOLDMAN:  And also this is an acting in

22   concert and conspiracy case.

23    THE COURT:  Got you.

24    MR. GOLDMAN:  Thank you.

25    BY MR. GOLDMAN:

1     Q.   Okay, so again, what would happen when she did not

2  work?

3     A.   On one occasion she described one of the younger

4  brothers who's also a Defendant in this case, which is Jose

5  Luis Moreno, showed up at her doorstep, pointed a gun at her

6  mother and also hit the mother in the chest when the mother

7  protected ABP from Jose Luis.

8     Q.   Okay, did she ever identify any actions taken by

9  this Defendant regarding violence against her when she did

10 not work?

11    A.   Yes --

12         THE COURT:  By "this Defendant," do you mean

13 Mr. Alecio?

14         MR. GOLDMAN:  By Mr. Alecio, yes, Your Honor.

15         THE COURT:  All right.

16         THE WITNESS:  Yes, on a separate occasion, she

17 refused to go back to the brothel and Mr. Alecio showed up

18 at her doorstep, went into the apartment, grabbed ABP by her

19 hair, and dragged her all the way to the street.  At some

20 point he let her hair go and looked at her and told her

21 William Lopez sent me to beat you up, but I feel pity on you

22 and walked away.

23    Q.   Okay, and did she ever identify this Defendant in

24 some sort of photographic manner?

25    A.   Yes, she described an unmarked photograph of

1  Mr. Alecio.

2        Q.   Okay, now were there any other victims of sex

3  trafficking that you interviewed in this case that recognize

4  this Defendant, Mr. Alecio?

5        A.   Yes.

6        Q.   Who else recognized him as far as victims that

7  have been identified in this matter?

8        A.   Victim NGL.

9        Q.   And what -- who is NGL?

10       A.   NGL was a 14-year-old at the time of the crime,

11 that was identified as a victim of sex trafficking.

12       Q.   Okay, and how did NGL recognize this Defendant?

13       A.   NGL described that where the brothel where she was

14 taken to work, that she saw Mr. Alecio drop off a female at

15 the same brothel and that the female was used for

16 prostitution as well, and the female was dropped and picked

17 up at around the same time she was when she was there during

18 that same time frame.  Usually drop-off time was 10:00 a.m.

19 and pick-up time was 2:00 a.m. -- yes, correct.

20       Q.   Yeah, and the women working at this brothel, they

21 were victims of sex trafficking?

22       A.   Correct.

23       Q.   Okay, and did any other victims of sex trafficking

24 also recognize this Defendant or identify this Defendant?

25       A.   Yes, two other ones.

1      Q.   And who -- and which two were they?

2      A.   It was AP, victim EMR, as well.

3      Q.   And just briefly, how did they recognize this

4  Defendant?

5      A.   Unmarked photographs that were shown to him -- to

6  them.

7      Q.   And what did it indicate this Defendant's

8  involvement was with the sex trafficking and the brothel?

9      A.   Friends of either Walter or William Lopez, as well

10 as very close-knit with the family.  Oftentimes he would do

11 whatever according to ABP -- EMR, often he would do whatever

12 the brothers needed him to do, either Walter Lopez or

13 William Lopez.

14     Q.   And when you say order him to do, to what are you

15 referring?

16     A.   Mainly for the females would be the violence

17 against them.

18          MR. GOLDMAN:  Okay, at this time, Your Honor, I

19 have no further questions for this witness.

20          THE COURT:  All right, thank you.

21          Mr. Adler?

22          MR. ADLER:  Yes, thank you.

23    CROSS-EXAMINATION OF SPECIAL AGENT DINAH MORALES

24     BY MR. ADLER:

25     Q.   Special Agent Morales, when you went through

1  training at the Quantico Academy, did you receive training

2  on how -- or whether victims of human trafficking or sex

3  trafficking sometimes are dishonest, did you ever discuss

4  that during training?

5       A.   No, sir.

6       Q.   So you were never given any instruction on how to

7  determine if alleged victim of sex trafficking or human

8  trafficking is telling the truth?

9       A.   It's mainly from my prior experience as a social

10 worker for the County Rape Center.

11      Q.   Okay, so what training were you given in that

12 position to help you determine when or if a victim of

13 trafficking is being dishonest?

14      A.   To pick up on red flags, such as their emotions,

15 the events they describe, and overall just over the rapport

16 building, the more you communicate with them.

17      Q.   But would you agree with me there's no hard and

18 fast rule or way of determining when an alleged victim of

19 trafficking is being completely truthful with you?

20      A.   Correct.  Over time I think I would say you can.

21      Q.   And I'm sorry, where did you say you did social

22 work?

23      A.   It was in El Paso County.

24      Q.   And who was your employer?

25      A.   It was Sexual Trauma and Assault Response

1  Services.

2       Q.   Okay, thanks.

3            Let's start with ABP first.

4       A.   Yes, sir.

5       Q.   This claim that Mr. Alecio showed up at the house

6  and pulled her by the hair, well, what corroboration of this

7  claim do you have?

8       A.   Just from her statement.

9       Q.   Okay, do you have any information about her

10 history of drug use?

11      A.   She did tell us about the drug use that was taking

12 place at the brothel.

13      Q.   That's not what I asked.  Do you have any

14 information about her use of illegal drugs?

15      A.   No, sir.

16      Q.   No information?

17      A.   Aside from that, no, sir.

18      Q.   Did you ever ask her if she's ever used illegal

19 drugs?

20      A.   Yes, that's when she brought up the brothel

21 information.

22      Q.   But did she say that she had used illegal drugs?

23      A.   From the brothel, yes.

24      Q.   So we're clear, ABP told you, a federal agent,

25 that she's been using illegal drugs?

1      A.    That they injected her, William Lopez injected

2  her.

3      Q.    And that was the only use that she said of illegal

4  drugs?

5      A.    Yes, sir, from the brothels.

6      Q.    Okay, do you have any information about her

7  criminal history?

8      A.    Yes.

9      Q.    Okay, what does her criminal history involve?

10     A.    She has some immigration violations and that was

11 the extent of it.

12     Q.    Okay, do you have any information about her

13 psychological history?

14     A.    She was evaluated by Immigration, but I don't know

15 if that's considered psychological.

16     Q.    Okay, did you -- you said you were one of the

17 co-case agents in this matter?

18     A.    Yes, sir.

19     Q.    Did you obtain any information during this

20 investigation that Mr. Alecio runs a brothel?

21     A.    No.  No, sir.

22     Q.    Did you receive any information during the

23 investigation or from other officers and agents involved in

24 this investigation about ABP's mother being involved in

25 brothel operations?

1      A.   Correct.

2      Q.   What did you learn about that?

3      A.   So she -- well one of the things that the mother

4  did was to supervise her daughter.  She often went with her

5  daughter to the brothel to protect her.

6      Q.   Okay, and your testimony is that ABP told you that

7  Mr. Alecio was told to beat her up, but then came to the

8  house and that, other than this claim that he dragged her

9  out of the house, he did not beat her up?

10      A.   Correct.

11           MR. GOLDMAN:  Object, Your Honor, misstating the

12  evidence.  I think grabbed them by the hair is beating them

13  up, pulling them over.

14           THE COURT:  Okay, I heard the evidence.  It is

15  zero.

16           MR. ADLER:  Not if they grab me by my hair.

17           THE COURT:  All right.  We won't go there.

18      BY MR. ADLER:

19      Q.   Okay, turning now to NGL.

20      A.   Yes, sir.

21      Q.   Okay, she was shown a photospread; is that

22  correct?

23      A.   Yes, sir.  It was different photographs, numbered.

24      Q.   Okay, so tell us about how that procedure was

25  done.  Are you familiar with the term a six-pack of

1  photographs or --

2       A.   Yes, sir.

3       Q.   Was she shown a six-pack?

4       A.   No.

5       Q.   Was she shown just individual photos?

6       A.   Correct.

7       Q.   Okay, how many photos was she shown?

8       A.   I don't remember off the top of my head, but it

9  can be anywhere from ten to 20.

10      Q.   And she identified a photo of Mr. Alecio?

11      A.   Yes.  If I'm not mistaken, it was photo No. 10.

12      Q.   Okay, and her claim at that point was this is the

13  individual who she saw drop off someone at the brothel?

14      A.   Yes.

15      Q.   Did she give a date on when that happened?

16      A.   No, but her time period was for three to four

17  months.

18      Q.   Did she say what time of day that she saw him?

19      A.   The same time usually was a drop-off and pick-up,

20  so she remembers that particular female because of the same

21  schedule they had.

22      Q.   Okay, did she see -- did she say that she saw him

23  once or more than one time?

24      A.   More than one time.

25      Q.   Okay, and did she say where she saw him, was it

1   across the parking lot or was in the apartment?

2        A.   At the apartment.

3        Q.   She said that?

4        A.   At the brothel.  Correct.

5        Q.   Okay, did she say she spoke with Mr. Alecio?

6        A.   No.

7        Q.   Did she say that she heard Mr. Alecio speak?

8        A.   No.

9        Q.   Okay, now turning to AP.

10       A.   Yes, sir.

11       Q.   She also was shown photographs in the same manner

12   as NGL?

13       A.   Correct.

14       Q.   Okay, and AP identified Mr. Alecio as a friend of

15   Walter or William Lopez?

16       A.   Correct.

17       Q.   Did she provide any other information about

18   Mr. Alecio?

19       A.   No, sir.

20       Q.   EMR was yet another victim, correct?

21       A.   (No audible response.)

22       Q.   Do you need some water?

23       A.   No.  Correct.

24       Q.   And she was shown photos in the same manner as AP

25   and NGL and ABP?

1      A.    For hers it was a little bit different.

2      Q.    Okay.

3      A.    It was the same method, it was just wallet photos.

4      Q.    And she also identified Mr. Alecio as a friend of

5   Walter or William Lopez?

6      A.    And part of the gang.

7      Q.    Okay, did she say -- did she identify any

8   activities that Mr. Alecio allegedly was involved in

9   originally?

10      A.    No, sir.

11      Q.    As co-case agent you are sort of the focal point

12   -- well not sort of, but you are the focal point for all of

13   the information in the investigation; is that correct?

14      A.    No, there's a lot of different elements to it, so

15   I have one element.  I guess you could better describe it

16   that way.

17      Q.    Are you familiar with Mr. Alecio's criminal

18   history?

19      A.    Yes.

20      Q.    You had a chance to research that?

21      A.    Some of it.  I think my partner kind of -- was --

22   researched more of that than I did.

23          MR. ADLER:  Okay, Judge, may I approach the

24   witness?  I think it would go over best.

25          THE COURT:  Yes, you may.

1       BY MR. ADLER:

2       Q.   I want to show you Mr. Alecio's criminal history

3   materials from the Harris County District Clerk's Office.

4   For example, he was charged with assault, battery, bodily

5   injury, a misdemeanor.  You see that?

6       A.   Yes, sir.

7       Q.   And do you see that the District Clerk's webpage

8   shows you all of the times he had to appear in court on that

9   case?  Do you see all those?

10      A.   I do.

11      Q.   Would you agree with me that it's 13 times?  You

12  can count it.  I mean, I've done it already, but you don't

13  have to take my word for it.

14      A.   Yes, sir.

15      Q.   He showed up in court 13 times over seven months

16  from October to May, and I have all of the other charges

17  against him.  I'm going to read them.  You're welcome to

18  double-check me on this, but he was charged with

19  unauthorized use of a motor vehicle.  That's the only felony

20  conviction he has there, correct?

21      A.   I thought he had three of them.

22      Q.   You want to check?

23      A.   Yes, well --

24      Q.   You can check.

25      A.   I'll let you.

1        Q.    Okay, he showed up at court 11 times over ten

2   months; is that correct?

3        A.    Correct.

4        Q.    He had a misdemeanor possession of marijuana case.

5   He showed up five times over two months?

6        A.    Okay.

7        Q.    He was actually charged with murder; is that

8   correct?

9        A.    (No audible response.)

10       Q.    It was dismissed; I can show it to you.  You see

11   this charge of murder and it says "No Bill"?

12       A.    Yes.

13       Q.    Do you understand that to mean the Grand Jury said

14   he was not responsible for this murder?

15       A.    Correct.

16            MR. GOLDMAN:  Objection, Your Honor, misstating

17   what a Grand Jury does.

18            THE COURT:  All right, let's move along,

19   gentlemen, and, Mr. Adler, I don't --

20            MR. ADLER:  I'm almost done.

21            THE COURT:  -- know if there's any point in

22   showing --

23            MR. ADLER:  She --

24   CONTINUED BY MR. ADLER:

25       Q.    Is there any indication that he didn't show for

1  court even when he was charged with murder?

2      A.   I'm not sure what periods of time he was detained

3  -- detention though.

4      Q.   Well --

5      A.   Was he detained or released?

6      Q.   He was out.  I'll show you this.  That's a good

7  question.

8          THE COURT:  I have the pretrial report.

9      BY MR. ADLER:

10     Q.   Do you see that he has a bond here?  Is that

11 correct?

12     A.   Yes, but it doesn't have a date.

13         THE COURT:  All right, Mr. Adler, let's move

14 along.  Ms. Morales really doesn't have much familiarity

15 with the state regulations.  Let's move.

16         MR. ADLER:  All right, well I'll proffer then at

17 the end of it.

18         THE COURT:  All right, thank you.

19     BY MR. ADLER:

20     Q.   Would you agree with me that he showed up in court

21 47 times on his cases without once having a problem?

22     A.   I'm not much sure on the number of times.

23     Q.   But you are the case agent in this case, right?

24     A.   One of them, yes, sir.

25     Q.   Okay, who's the other one?

1      A.   There's Vivian Guerrero.

2      Q.   I'm sorry, what's her name?

3      A.   His name is Vivian Guerrero.

4      Q.   Oh, Guerrero.

5      A.   And then we have Stacy Mamasis.

6      Q.   The last name, could you spell it?

7      A.   M-A-M-A-S-I-S.

8      Q.   Thank you.

9           When Mr. Alecio was arrested, did he try to flee?

10     A.   I am not sure on that.  I wasn't present.

11     Q.   Did anybody tell you that he did try to flee?

12     A.   No, I didn't ask.

13     Q.   Was he arrested with any weapons?

14     A.   I am not sure.

15     Q.   Were you told that he was arrested with any

16 weapons?

17     A.   No, sir.  All the Defendants had weapons around,

18 but I'm not sure of Mr. Alecio.

19     Q.   Okay, but you can't identify a single other

20 officer or agent who told you Mr. Alecio had a weapon on him

21 when he was arrested?

22     A.   Correct.

23     Q.   Did he have any drugs on him when he was arrested?

24     A.   I don't know.

25     Q.   Did anybody tell you that he had drugs on him?

 1      A.    Correct, no.

 2      Q.    Did he have any large amounts of cash on him when

 3 he was arrested?

 4      A.    No, sir, not that I know of.

 5            MR. ADLER:  That's all I have for this witness,

 6 Your Honor.

 7            THE COURT:  I have some questions, Ms. Morales.

 8            When did this supposedly happen with ABP?

 9            THE WITNESS:  With ABP it started in 2016.

10            THE COURT:  Okay, when was the involvement with

11 Mr. Alecio?

12            THE WITNESS:  Mr. Alecio was the summer of 2016.

13            THE COURT:  2016, and then EMR, her information to

14 you about Mr. Alecio is what?

15            THE WITNESS:  Her time frame of the victimization

16 was 2013.

17            THE COURT:  No, what was her interaction with

18 Mr. Alecio?

19            THE WITNESS:  Ms. -- she just remembered him from

20 the photographs.

21            THE COURT:  Okay, remembered him how?  I mean, I

22 know she identified him from the photographs, but how --

23            THE WITNESS:  Yes, ma'am.

24            THE COURT:  How does she say he's connected to

25 this organization?

1          THE WITNESS:  He was -- she described him as being

2     one of the members of the Southwest Cholos, as well as one

3     of the members of the -- almost like a family member to the

4     Maria Angelica Moreno-Reyna's family.

5          THE COURT:  Because how, what did she say he did

6     or did not do or said or didn't say?

7          THE WITNESS:  He was --

8          THE COURT:  What --

9          THE WITNESS:  He was part of the -- he always went

10    to the same family reunion, same family -- he was always

11    around the family and the brothers.

12         THE COURT:  He was like a part of the family?

13         THE WITNESS:  Yes, ma'am.

14         THE COURT:  And NGL, what did she say Mr. Alecio

15    did?

16         THE WITNESS:  NGL was at a brothel when she saw

17    Mr. Alecio.  Every time she was dropped off at the brothel,

18    she would see him dropping off another girl that worked

19    there at the brothel.

20         THE COURT:  And she saw him how many times?

21         THE WITNESS:  Throughout a three-month --

22    four-month period periodically, regularly.

23         THE COURT:  Periodically.  All right, then, thank

24    you.

25              And that was when?

1            THE WITNESS:  Her time period was 2013.

2            THE COURT:  Okay, thank you.

3            THE WITNESS:  Yes, Your Honor.

4            THE COURT:  You can step down.

5        (Witness steps down.)

6            THE COURT:  Your next witness, Mr. Goldman?

7            MR. GOLDMAN:  Yes, Your Honor.  Deputy Vivian

8    Guerrero, Your Honor.

9            THE COURT:  Mr. Guerrero, come forward please.

10       (Witness sworn.)

11           MR. GOLDMAN:  Shall I begin, Your Honor?

12           THE COURT:  Please.

13        DIRECT EXAMINATION OF DEPUTY VIVIAN GUERRERO

14    BY MR. GOLDMAN:

15    Q.    Please state your name and occupation for the

16   Record?

17    A.    Vivian Guerrero, Deputy with the Harris County

18   Sheriff's Office.

19    Q.    And for how long have you been a Deputy with the

20   Harris County Sheriff's Office?

21    A.    19 years.

22    Q.    And to what division are you currently assigned?

23    A.    Currently FBI Houston's multiagency gang task

24   force.

25    Q.    Are you currently deputized to enforce federal

1  laws as part of the task force?

2      A.   Yes, sir.

3      Q.   And what are your duties as a member of the task

4  force?

5      A.   Investigate gangs to include sex trafficking,

6  human trafficking, drug trafficking, gun trafficking, all

7  federal and state laws.

8      Q.   Okay, and what prior law enforcement experience,

9  if any, do you have?

10     A.   A year of Brazos County Sheriff's Office as well.

11     Q.   Okay, are you familiar -- do you also receive

12  training in drug trafficking cases?

13     A.   Yes, sir.

14     Q.   And have you been part of drug trafficking

15  interdiction operations before?

16     A.   Yes, sir.

17     Q.   Are you familiar with an individual known as

18  "Giovanni Alecio"?

19     A.   Yes, sir.

20     Q.   Do you see him in court today?

21     A.   That gentleman right here in the blue jumpsuit.

22          MR. GOLDMAN:  Let the Record reflect he's

23  indicated the Defendant herein, Your Honor.

24          THE COURT:  All right.

25          (Defendant identified.)

 1      BY MR. GOLDMAN:

 2      Q.    Are you one of the co-case agents assigned to the

 3  matter?

 4      A.    Yes, sir.

 5      Q.    Do you know any nicknames that Mr. Alecio's known

 6  by?

 7      A.    Yes, sir.  "Whiteboy."

 8      Q.    Are you familiar with an incident that occurred on

 9  October 7th, 2016, involving Mr. Alecio?

10      A.    Yes, sir, it was a gun buy.

11      Q.    Was this whole matter videotaped and audio

12  recorded?

13      A.    Audio and photographed, yes, sir.

14      Q.    Okay, beginning on October 6th, 2016, could you

15  please tell us what happened regarding Mr. Alecio?

16      A.    That day Alecio contacted a confidential unit

17  source in regards to him wanting to sell guns.  An agreement

18  was made for the purchase of four weapons, four handguns for

19  the price of $1600.  The agreement the next day was when the

20  exchange of the money and guns were going to be done.  That

21  day the source contacted Alecio, it was recorded, and then

22  Alecio was not in a nearby location or anything, so he made

23  the arrangements with Victor Gonzalez to coordinate the

24  pick-up and exchange the money and guns.  It was done off

25  the Southwest Freeway with surveillance teams around taking

1   photos.  The exchange of money and guns was done in Victor

2   Gonzalez's truck, wrecker truck.  Money was exchanged, it

3   was also audio recorded, and the gun was -- the guns and

4   things were exchanged and they parted ways and that's when

5   we met and recovered the weapons.

6        Q.   And when you recovered the weapons, what did you

7   learn about origins?

8        A.   Three of the four weapons were stolen.

9        Q.   Okay, and were you part of that team that was

10  there at the scene?

11       A.   Yes.

12       Q.   Okay, were there any conversations involving this

13  Defendant and Mr. Alecio and the source afterword?

14       A.   Yes, sir, about three days later on the 10th of

15  October, Alecio sent a text message to the source in regards

16  if he was interested in buying a Bush Master .223 rifle and

17  a Taurus .40 caliber rifle.

18       Q.   And what kind of weapon is a Bush Master .223?

19       A.   AR-15 assault rifle.

20       Q.   Okay, are you familiar with whether or not an

21  arrest was made in this case on November 7th, 2017 at the

22  Carriage Way Apartments?

23       A.   Yes, sir.

24       Q.   And what is the address of the Carriage Way

25  Apartments?

1      A.    6011 and 6023 Dashwood.

2      Q.    Okay, were search warrants executed at that time?

3      A.    Yes.

4      Q.    Were weapons recovered?

5      A.    Yes, sir.

6      Q.    And did they match the description of the weapons

7  that he offered the sell?

8      A.    Yes, sir.

9      Q.    And was surveillance being conducted by the way of

10  the Carriage Way Apartments during this whole time period

11  from October 7th, 2016, throughout to the arrest on

12  November 7th, 2017?

13      A.    Yes, sir.

14      Q.    And was the Defendant at that location numerous

15  times during that surveillance?

16      A.    On the surveillance, yes, sir, he was there.

17      Q.    Okay, and how many weapons were found at that

18  location by the way?

19      A.    23 weapons.

20      Q.    And what kind of weapons were found amongst those

21  23?

22      A.    From assault rifles to handguns to long rifles,

23  hunting rifles,

24      Q.    Okay, and whose apartments, if any, amongst these

25  Defendants that are charged in this case, were the guns

1  found in?

2      A.   Brady Montes AKA King Mono and Jose Luis Moreno

3  AKA Lucky's apartment.

4      Q.   Did a Court authorize wire and electronic

5  intercepts in this matter?

6      A.   Yes, sir.

7      Q.   Did you review the applications for those wire and

8  electronic intercepts?

9      A.   Yes, sir.

10     Q.   Was the Defendant's phone subject to those wire

11  and electronic intercepts?

12     A.   Yes, sir.

13     Q.   And based on your review of the applications, what

14  did you identify as far as the calls that he made regarding

15  any criminal activity?

16     A.   He -- him and King Mono -- he -- him and King Mono

17  managed the distribution of meth and coke.

18          THE COURT:  Who?

19          THE WITNESS:  Oh, I'm sorry, Freddy Montes AKA

20  King Mono.

21          MR. GOLDMAN:  Judge, just to clarify.

22  BY MR. GOLDMAN:

23     Q.   When you say "King Mono," are you referring to

24  Defendant Freddy Montes?

25     A.   Yes, sir, sorry.

1     Q.   Is he a Defendant in this case?

2     A.   Yes, sir.

3     Q.   Has he been apprehended?

4     A.   No, sir.

5     Q.   So he's still at large?

6     A.   He's still at large.

7     Q.   So how -- what -- now -- and you are referring to

8  him as "King Mono"?

9     A.   Yes.

10    Q.   And what is this Defendant's relationship, if any,

11 to King Mono based on your investigation?

12    A.   Based on investigation and surveillance, they're

13 close friends.  They're all together.  And also during wire

14 intercepts, they're in together to manage the distribution

15 of narcotics.

16    Q.   Okay, and based on the application -- the wire

17 application -- were any recordings uncovered from April of

18 2017 from this individual?

19    A.   Yes.

20         THE COURT:  Okay, which individual?

21         MR. GOLDMAN:  From Defendant Alecio.

22         THE WITNESS:  Yes.

23    BY MR. GOLDMAN:

24    Q.   Did you record any from April 6th of this year

25 from this Defendant?

1      A.    Yes.

2      Q.    Mr. Alecio?

3      A.    Yes.

4      Q.    And if you could briefly describe to the Court the

5  substance of that intercept?

6      A.    The conversation between Alecio and Freddy Montes

7  in regards to narcotics, Montes tells Alecio that had some

8  "moon rocks," which is --

9           MR. ADLER:  Judge, if I could -- I'm sorry.

10          THE WITNESS:  I'm sorry.

11          MR. ADLER:  I just to need to lodge an objection.

12  There's no allegation of drug distribution in this

13  Indictment.  I think it's not relevant.

14          THE COURT:  Well I think it does go to danger, so

15  I'll allow a little bit.

16          Let's move ahead.

17      BY MR. GOLDMAN:

18      Q.    Please continue.  So what happened on April 6th,

19  2017?

20      A.    They were talking about narcotics, Montes and

21  Alecio, about different narcotics.  At one point Alecio

22  tells Montes if he knows anybody wants some breeze, which in

23  drug talk it's meth, and that Montes asked Alecio how much.

24  Alecio says he sells it for seven, which means 7,000 per

25  kilo, but he has a source or he has somebody that sells it

1  for 65 or $6,500.  So that was in regards to narcotics that

2  they had him selling.

3      Q.    Were there any other conversations on April 6th,

4  2017?

5      A.    That day there was another conversation between

6  Freddy Montes and Alecio in regards to surveillance that was

7  also by an HPD officer --

8            THE COURT:  What as the discussion?

9            THE WITNESS:  Okay, I'm sorry.

10           THE COURT:  Let's stick to one topic at a time.

11           THE WITNESS:  He asked why Alecio -- Montes asked

12 Alecio where he was at and are the cops gone?  And Alecio

13 says, "I don't know, I walked out and locked the door."  And

14 Montes says, "I know I saw you," and you know, so he --

15 they're talking about where he was at.

16     BY MR. GOLDMAN:

17     Q.    Allow me to ask you, was there video surveillance

18 or physical surveillance being done at this same time?

19     A.    Yes.

20     Q.    And based on that surveillance combined with the

21 recorded conversations, where were they, where was this

22 taking place, where was Mr. Alecio?

23     A.    Apartment 31B.

24     Q.    And what facility?

25     A.    The Dashwood Carriage Way Apartments.

1    Q.   Okay, and what was found at that apartment, if

2    anything, on the date of the arrest on November 7th?

3    A.   That day handguns, rifles, narcotics, drugs, and

4    money.

5    Q.   Okay, and based on these conversations, what

6    exactly was Mr. Alecio's role regarding that apartment?

7    A.   Securing it, keeping guard of that apartment.

8    Q.   All right, now I'd like to direct your attention

9    to April 22nd, 2017.  Did they have any conversation

10   regarding drug distribution on that date?

11   A.   Yes, again, a conversation between Alecio and

12   Montes.  Alecio asked Montes to come to the mall area in

13   regards to him having some marijuana that he wanted Montes

14   to inspect, to look at.

15   Q.   And what about on April 24th, 2017?

16   A.   It's narcotic -- in reference to narcotics again.

17   Alecio contacts Montes to ask him if he had any work, which

18   means narcotics, you know, and Montes says, "No," he had

19   none.  He asked again, you don't even have indoors, a type

20   of marijuana, that he needed ten bows, which regards to

21   about ten pounds of weed -- or marijuana, I'm sorry, and

22   that's the in regards to marijuana talk.

23   Q.   Okay, now are you aware of any prior convictions

24   Mr. Alecio has?

25   A.   Yes.

1      Q.   Are you familiar with the conviction he has on

2  May 30th, 2017, for a misdemeanor weapons charge?

3      A.   Yes.

4      Q.   Did you also review the records from not only his

5  arrest in that matter on September 30th, 2016, but

6  intercepted jail calls that he made?

7      A.   Jail calls and officers had body camera that day.

8      Q.   Okay, based on those jail calls and body cams,

9  what did he state during the intercepted portions?

10     A.   At the time of the arrest his co-Defendant in that

11  case body cam caught Alecio telling him to take the gun

12  charge because it would be a misdemeanor for him and a

13  felony for him because he has -- he's a felon -- previous

14  felony convictions.  So it's clear and it's in the --

15  Houston Police Department's report as well, and him trying

16  to convince Vladimir Rubio to take the gun charge.

17     Q.   Okay, and did they have similar conversations via

18  the intercepted jailhouse calls as well?

19     A.   Yes, sir.

20     Q.   And did he also indicate that he would help

21  Mr. Rubio getting an attorney?

22     A.   Yes, sir.

23     Q.   And you mentioned that he had a prior felony

24  conviction, correct?

25     A.   Yes.

1      Q.    And what is that felony conviction for?

2      A.    Unauthorized use of a motor vehicle.

3      Q.    And does he have any other prior criminal

4  convictions that go to violence?

5      A.    Assault, he was also -- in May there was a

6  conviction -- convicted of assault.

7      Q.    Okay, and what was he -- did you learn about the

8  factual background of that assault?

9      A.    Assault of a security guard at the Bonny Club.  He

10 was being escorted out and he turned around and struck the

11 security guard and then two associates of his also jumped in

12 and began assaulting the security guard.

13     Q.    Now have you reviewed the Houston Police

14 Department and Texas DPS gang tracker databases?

15     A.    Yes.

16     Q.    Is Mr. Alecio in those databases?

17     A.    Yes, he's documented as --

18     Q.    And what is he documented as?

19     A.    He's documented as a Southwest Cholos.

20           MR. GOLDMAN:  Okay, at this time, Your Honor, I

21 have no further questions.

22           THE COURT:  Mr. Adler?

23       CROSS-EXAMINATION OF DEPUTY VIVIAN GUERRERO

24     BY MR. ADLER:

25     Q.    Is it Deputy?

1       A.   Yes, sir.

2       Q.   The misdemeanor -- the assault charge you just

3   referenced was a felony or misdemeanor?

4       A.   It's a misdemeanor, sir.

5       Q.   And do you know what the punishment that

6   Mr. Alecio received on that?

7       A.   Jail time --

8       Q.   30 days sound about right?

9       A.   Yeah, I think 30 days.

10      Q.   And were you aware that he voluntarily surrendered

11  for that sentence?

12      A.   Yes, sir.

13      Q.   And that he made all his court appearances in that

14  case?

15      A.   If that's true -- I don't know about the court

16  appearances, sir.

17      Q.   He had 13 court appearances in that case over

18  seven months.

19      A.   Okay.

20      Q.   And he still voluntarily showed up for sentencing.

21      A.   Okay.

22      Q.   Fair enough?

23      A.   Fair enough.

24      Q.   Okay, Mr. Victor Gonzalez was the one who -- the

25  co-Defendant Victor Gonzalez was the one who actually

1  delivered the guns to --

2       A.   Yes.

3       Q.   -- the confidential informant?

4       A.   Yes.

5       Q.   And he's charged in this case?

6       A.   Yes, sir.

7       Q.   And he's been released on bond; is that correct?

8       A.   Yes, sir.

9       Q.   Okay, now you've testified that it was Mr. Alecio

10 that contacted the confidential informant?

11      A.   Yes, sir.

12      Q.   How do you know it was Mr. Alecio?

13      A.   Through phone -- the phone numbers and also, you

14 know, hearing him before and that's the number that source

15 communicates with Alecio.

16      Q.   Okay, so that number, who's it registered to?

17      A.   I don't know off the top of my head.

18      Q.   Okay, and that number -- how do you know

19 Mr. Alecio was in possession of that phone on the day that

20 he was contacting -- whoever it was, contacting the CI?

21      A.   He was -- they communicated over the phone, so the

22 previous dealings with him that he knew that was Alecio.

23      Q.   So the source is the one telling you that it was

24 Alecio on the other side?

25      A.   Yes.

1      Q.    And Mr. Alecio did not show up to deliver any

2 guns?

3      A.    No, the -- he said he wasn't close.

4      Q.    And the informant in the case is working with law

5 -- I don't need to know his name or anything, but is working

6 with law enforcement because of prior criminal problems?

7      A.    (No audible response.)

8      Q.    Pending criminal problems?

9      A.    Not necessarily.

10      Q.    Working with law enforcement to earn some money?

11      A.    Tired of what was going on -- the violence, and

12 just wanted to help out.

13      Q.    Good citizen?  Just being a good citizen?

14      A.    I couldn't say that.

15      Q.    Does that informant have a criminal history?

16      A.    I believe so, yes.

17      Q.    What is that criminal history consist of?

18      A.    I don't know off the top of my head.  I can't --

19      Q.    Felony convictions?

20      A.    Possibly.  I don't know that right off the top of

21 my head.  I can't tell you without --

22      Q.    And you are the other co-case agent in this case?

23      A.    Yes.

24      Q.    Are there any other case agents other than you and

25 Ms. --

1        A.    Morales?

2        Q.    Thank you.

3        A.    She -- I think she advised me on Mamasis.

4        Q.    All right.  I'm sorry, it's three, three co-case

5   agents, okay.  So whatever recordings were made the day --

6   or surveillance was conducted the day the guns were

7   delivered to the informant, Mr. Alecio is not in those

8   photographs or video recordings?

9        A.    No, sir.

10       Q.    Okay, was anybody surveilling him that day to see

11  where he was?

12       A.    No, we -- no.

13       Q.    And these discussions you had with the Prosecutor

14  about drug allegations, the Indictment in this case has

15  37 counts; is that correct?

16       A.    Yes, sir.

17       Q.    It's 45 pages long?

18       A.    It's long.

19       Q.    A lot of work went into that that Indictment?

20       A.    Yes, sir.

21       Q.    Are there any allegations of drug distribution

22  against Mr. Alecio in that Indictment?

23       A.    No, sir.

24       Q.    And then this comment that you say Mr. Alecio made

25  when he was arrested that the other person should take the

1  gun because it would be a felony charge for Mr. Alecio, but

2  a misdemeanor person for the other -- a misdemeanor charge

3  for the other person, you remember that testimony?

4       A.   Yes, sir.

5       Q.   It ultimately ended up being a conviction for

6  misdemeanor for Mr. Alecio?

7       A.   They pled it -- I believe they pled it down from

8  felony possession of a weapon to misdemeanor UCW.

9       Q.   And he appeared nine times in court on that case?

10      A.   If you say so, sir, I don't know.

11      Q.   Over seven months?

12      A.   If you say so.  I don't know.

13      Q.   And he pled on May 25th, but he surrendered for

14 sentence on May 30th.

15      A.   Okay.

16      Q.   Does that sound right?

17      A.   Seven.

18      Q.   And then on that -- going back to that misdemeanor

19 assault, you said there were two other people involved in

20 the case?

21      A.   Yes.

22      Q.   But the charges were dismissed against those

23 people?

24      A.   I'm not 100 percent sure on that.  I know he pled

25 to that.

1          MR. ADLER:  That's all I have for this witness,

2    Your Honor.

3          THE COURT:  You may step down.

4       (Witness steps down.)

5          THE COURT:  Any further witnesses?

6          MR. GOLDMAN:  No, Your Honor.

7          THE COURT:  Any witnesses or proffers, Mr. Adler?

8          MR. ADLER:  Yeah, just some proffering.

9          THE COURT:  All right.

10          MR. ADLER:  May I proceed?

11          THE COURT:  Yes.

12          MR. ADLER:  Judge, we've got a number of people

13    here in court today.  I'm going to call out their names and

14    ask that they rise and then sit down after they --

15          MR. GOLDMAN:  Are they going to testify, Your

16    Honor?

17          MR. ADLER:  No.

18          THE COURT:  He said proffer.

19          MR. GOLDMAN:  Okay.

20          MR. ADLER:  I have first Mr. Alecio's mother Ester

21    Melara, obviously known Mr. Alecio his whole life.  She's a

22    housewife, a U.S. citizen, no criminal history, owns her

23    home, happy to sign on bond for Mr. Alecio and also will

24    allow -- well not allow, but he can live in her house -- if

25    the Court sees fit to grant the bond.

1          Erick Melara, Mr. Alecio's step-father, works the

2    roofing and remodeling business.  Pretrial Services report

3    indicates that Mr. Alecio has actually worked for

4    Mr. Melara.  He has no criminal history, also owns his own

5    home, also willing to sign on a bond.

6          We have Sandra Milano, thank you.  Mr. Alecio's

7    aunt, who's a housewife with no criminal history willing to

8    sign on a bond to assure that Mr. Alecio will appear in

9    court.

10          Jennifer Villarreal who is Mr. Alecio's wife, a

11   U.S. citizen, no criminal history -- thank you.  Also

12   willing to sign on a bond, but also -- all of these people

13   would also testify that Mr. Alecio is not violent or

14   dangerous and is not --

15          MR. GOLDMAN:  Your Honor, I would object to that

16   being part of a proffer.  If they're going to testify, I'd

17   like to have them testify.

18          MR. ADLER:  That's what their proffered testimony

19   would be.

20          THE COURT:  Go head.  Go ahead.

21          MR. ADLER:  Veronica Guzman, who is a -- formerly

22   in a relationship with Mr. Alecio.  Thank you.  She's a U.S.

23   citizen, works as a dental -- at a dentist office, has no

24   criminal history.

25          Genesis Diaz, his sister-in-law, works at Reliant,

1   U.S. citizen, no criminal history.

2          We have two others who couldn't make it today, so

3   I won't even go into those.

4          THE COURT:  All right.

5          MR. ADLER:  But all of those people are willing to

6   sign on a bond and all of them would testify that he's not

7   dangerous, not a risk of flight.

8          So that would be my proffer in that regard, Your

9   Honor, as far as witnesses.

10         THE COURT:  Why didn't Mr. Alecio's mother and

11  step-father speak with Pretrial?

12         MR. ADLER:  You know, Judge, that I don't know.

13         THE COURT:  I'm going to recess this.  I want

14  Pretrial to interview -- I'm sorry, spell the last name for

15  me, please, I missed that.

16         MR. ADLER:  The mother's name, first name Esther,

17  E-S-T-H-E-R, last name Melara, M-E-L-A-R-A.  And her

18  husband, Mr. Alecio's step-father, Erick, E-R-I-C-K, Melara,

19  M-E-L-A-R-A.

20         THE COURT:  Ms. Troiani, could somebody

21  interview --

22         MS. TROIANI:  Yes, Your Honor.

23         THE COURT:  -- these individuals and vet this and

24  what's your schedule this afternoon?

25         MR. ADLER:  Whatever the Court chooses.

1          THE COURT:  At 3:30.  I'll see you-all back at

2   3:30.

3          MR. ADLER:  Thank you, Judge.  I'm going to

4   have --

5          THE COURT:  You said Mr. Melara is a homeowner?

6          MR. ADLER:  Mr. Melara is a homeowner.

7          THE COURT:  All right.  Yes?

8          MR. ADLER:  I'm going to take the two of them down

9   to the Pretrial Services Office on the sixth floor.

10         THE COURT:  Okay, well wait to hear from

11  Ms. Troiani what she wants them to do.

12         MR. ADLER:  Okay, just let me know.

13         MS. TROIANI:  Yes, Your Honor.

14     (Court attends an unrelated matter briefly.)

15         MR. ADLER:  So Mr. Alecio can be removed from the

16  courtroom, right, Your Honor?

17         THE COURT:  Yes.

18         MR. GOLDMAN:  We should be back at 3:30, Your

19  Honor.

20         THE COURT:  Yes, sir.

21     (Recess taken from 12:10 p.m. to 3:15 p.m.)

22         THE COURT:  Are you-all ready on Mr. Alecio?

23         MR. ADLER:  Yes, Your Honor.

24         MR. GOLDMAN:  Yes, Your Honor.

25     (The Court confers with staff.)

1           THE COURT:  Have you seen the Pretrial Services

2   addendum, Mr. Goldman?

3           MR. GOLDMAN:  Yes, Your Honor.

4           THE COURT:  Have you seen it, Mr. Adler?

5           MR. ADLER:  Yes, and to answer the Court's

6   question right before we left, why they had not been

7   interviewed, no one had asked them to be interviewed, that's

8   all it was.

9           THE COURT:  Okay.

10          MR. GOLDMAN:  Your Honor, there were two matters

11  that I needed to bring to the Court's attention.

12          THE COURT:  Okay.

13          MR. ADLER:  Judge, I would object to the

14  Government trying to reopen the evidence at this point.

15          THE COURT:  Well if we're going to reopen

16  evidence, we're going to have witnesses.  You can't testify.

17          MR. GOLDMAN:  I'm offering a proffer, I guess, of

18  counsel.

19          THE COURT:  Well you don't make a proffer.  Read

20  the rules.

21          MR. GOLDMAN:  Okay, it's just regarding the claim

22  that was made by Counsel, Your Honor.  I'll bring in the

23  witness if you'd like.  Shall I bring in the witness?

24          THE COURT:  Sure, bring in the witness.

25          MR. GOLDMAN:  I'll bring in both witnesses, Your

1    Honor, do you want me to get them?

2          THE COURT:  Well who's the witness who's going to

3    testify to whatever it is you want me to know?

4          MR. GOLDMAN:  I'll have Vivian Guerrero testify,

5    Your Honor.

6          THE COURT:  All right.

7          MR. ADLER:  Again, Judge, for the Record I'm

8    objecting to reopening the evidence.

9          THE COURT:  Okay.  All right.

10         MR. GOLDMAN:  Okay.

11       (Recess taken from 3:16 p.m. to 3:18 p.m.)

12         THE COURT:  Can someone check on Mr. Goldman?

13         MR. ADLER:  Do you want me to check?

14         MR. GOLDMAN:  Your Honor, I would call Agent

15   Morales testify.

16         THE COURT:  All right, whatever.

17         Ms. Morales, you're still under oath, so please

18   take a seat --

19         MS. MORALES:  Yes, Your Honor.

20         MR. GOLDMAN:  Shall I begin, Your Honor?

21         THE COURT:  Sure.

22      REDIRECT EXAMINATION OF SPECIAL AGENT DINAH MORALES

23      BY MR. GOLDMAN:

24      Q.   Agent Morales, do you recall Mr. Adler asking

25   questions about his court appearances in state court; do you

1    remember that?

2        A.   Yes, correct.

3        Q.   And he also asked Deputy Guerrero about that,

4    correct?

5        A.   Yes.

6        Q.   Did you find anything indicating that he did not,

7    in fact, show up at all of his court appearances?

8        A.   Yes, correct, in 2012.

9        Q.   What did he have in 2012?

10       A.   So in 2012 he missed court, so he was arrested for

11   the Court.

12       Q.   Okay, as he indicted?

13       A.   Yes, he had a felony Indictment.

14       Q.   Now was that for bail forfeiture?

15       A.   Correct.

16       Q.   Okay, also --

17            THE COURT:  Stop right there.

18            Pretrial, why is that not noted in the criminal

19   history?

20            MR. ADLER:  Judge, if I could?  It's not an

21   Indictment.

22            MR. GOLDMAN:  Your Honor, I have a copy of the

23   court record.  I have a copy for counsel also.

24            MR. ADLER:  It's a civil --

25            THE COURT:  I want to hear from Pretrial, please.

1    I'm not --

2              MR. ADLER:  It's a civil matter.

3              THE COURT:  -- going to squabble with the lawyers

4    about it.  Well bond forfeiture is a civil case.

5              MR. ADLER:  Bond forfeiture is a civil case in

6    this case, Judge.  I have the documents here.  I don't need

7    those, Mr. Goldman.

8              MR. GOLDMAN:  Okay.

9              MR. ADLER:  I think I can clear it up on Cross.

10             THE COURT:  All right.  Clear it up on Cross.

11             MR. GOLDMAN:  Shall I continue, Your Honor?

12             THE COURT:  Yes, go ahead, but I want Pretrial to

13   take this up.

14             MR. GOLDMAN:  Okay.

15        BY MR. GOLDMAN:

16        Q.  And why -- do you know why he didn't appear in

17   court that day?

18        A.  One second.  No, I am not aware of why he --

19        Q.  Okay.

20        A.  -- skipped bail.

21        Q.  Okay, do you know whether or not it's a violation

22   of the terms of bond for somebody to get rearrested?

23        A.  I'm sorry, could you repeat that?

24        Q.  Is it a violation of bond terms in Harris County

25   to get rearrested?

1      A.   Yes.

2      Q.   Okay, also in the presentence report it states

3  that the Defendant only traveled once to Cancun two years

4  ago; is that correct?  Is that true or false?

5      A.   That is false according to records.

6           THE COURT:  This witness is not supposed to have

7  access to the pretrial report.

8           MR. GOLDMAN:  Okay.

9           THE COURT:  So let's just stop right there.

10          MR. GOLDMAN:  All right, well I'll ask her a

11 different question, Your Honor.

12     BY MR. GOLDMAN:

13     Q.   Are you aware of any travel that the Defendants

14 had out of the country in last two years?

15          MR. ADLER:  Judge, I'm going to object in light of

16 that --

17          THE COURT:  I want to hear the answer.

18          THE WITNESS:  Yes, about a week-and-a-half ago

19 through the Texas that we were able to determine that he

20 made travel in January of 2017.

21     BY MR. GOLDMAN:

22     Q.   To where?

23     A.   He was inbound from Mexico via the Pharr Port of

24 Entry.

25     Q.   Okay, so he did travel in the last year to Mexico

 1   and back?

 2       A.   Yes, about 11 months ago.

 3            MR. GOLDMAN:  Okay, no further questions, Your

 4   Honor.

 5            THE COURT:  Mr. Adler?

 6            MR. ADLER:  If I may, Your Honor?  I'm going to

 7   have to approach again, Your Honor.

 8            THE COURT:  Okay.

 9            MR. GOLDMAN:  Your Honor, I'd like to know what

10   you're showing these witnesses.  I've never seen any of

11   this.

12            THE COURT:  These are court documents.  You-all

13   need to take it back --

14            MR. GOLDMAN:  But, Your Honor, I've never seen --

15   he goes to --

16            THE COURT:  Mr. Goldman, settle down.

17            MR. GOLDMAN:  I think I --

18            THE COURT:  Ask to see it.

19            MR. GOLDMAN:  I would like to see what he's

20   showing the witnesses.

21            THE COURT:  All right, please show Mr. Goldman.

22            MR. ADLER:  I don't think he's got any right to

23   see it until I question the witness.

24            THE COURT:  I know.  Just let him see it.  Let's

25   not squabble like three-year-olds, please.

1          MR. ADLER:  I got it.

2     (The Court confers with staff.)

3      RECROSS-EXAMINATION OF SPECIAL AGENT DINAH MORALES

4     BY MR. ADLER:

5     Q.   Special Agent, I noticed you have some notes in

6 your hand?

7     A.   Yes, sir.

8          MR. ADLER:  Judge, could I see the notes?

9          THE COURT:  Yes, you may.

10          MR. GOLDMAN:  Your Honor, for the Record, that is

11 what I tried to give Counsel before he said he already had

12 it.

13          THE COURT:  Okay.

14          MR. ADLER:  For the Record, Judge, there's another

15 document here that the Prosecutor did not try to give me.

16          Thank you.

17     BY MR. ADLER:

18     Q.   Okay, Special Agent, I'm going to read what the

19 Court records show and if you disagree with anything or have

20 any questions I'm going to show it to you, but to save time

21 I'm going to read through it.

22     A.   Yes, sir.

23     Q.   You're talking about a bond forfeiture on a

24 misdemeanor possession of marijuana case, correct?

25     A.   It's a felony Indictment.

1      Q.   No, it is not felony Indictment on the misdemeanor

2  possession of marijuana case.  Do you want the cause number?

3      A.   Sure.

4      Q.   What are you looking at?

5      A.   I am looking at an office of the Harris County

6  Clerk's Office.

7      Q.   Okay, so it's in County Court-at-Law 7, you know

8  they don't handle felonies at County Court-at-Law?

9      A.   I did not know that.

10      Q.   Okay.

11      A.   Is that a state --

12      Q.   So why do you think this is a felony Indictment?

13      A.   Because it has it right here, "Felony Indictment."

14      Q.   Okay, and this is for -- let me show you what I

15  have.  What the cause number you're reading off of?  This

16  number right --

17      A.   Yes, it's 182566001018.

18      (Pause in proceedings.)

19      Q.   So what is the cause number that I'm showing you

20  here, 1825660?

21      A.   Correct.

22      Q.   Okay, is this for a misdemeanor possession of

23  marijuana case?

24      A.   (No audible response.)

25      Q.   Do you have it, a misdemeanor charge possession of

1    marijuana?

2         A.   That's what it does say.

3         Q.   Okay, so Cause 1825660 is a misdemeanor marijuana

4    case, right?

5         A.   Yes, according to your record.

6         Q.   This isn't my record.  This is the County Clerk's

7    record.

8         A.   According to the record you showed me, yes, sir.

9         Q.   And that case was filed back in May of 2012,

10   correct?

11        A.   I have a file date of August 28th, 2012.

12        Q.   Okay, let me show you again.  I don't know what

13   the Government gave you, but let me show you what the Court

14   record shows.  See it says "charging instrument," what's the

15   date?

16        A.   For the Complaint it's on May 2012, for the case

17   completion, it's November 27th, 2012.

18        Q.   I just asked you what time was it filed.

19        A.   Oh, yes.

20        Q.   It's filed in May of 2012, correct?

21        A.   Yes.

22        Q.   And then Mr. Alecio was on bond for this case,

23   right?

24        A.   I have it "no bond" down here at the end.

25        Q.   Okay, let me show you.  I think what you're

1  looking at is the civil case that was filed for the bond

2  forfeiture.  That may be the confusion, but I'll show you

3  whatever you want to see.  Do you want to see where he is on

4  bond?  I'll just show you where he's on bond.

5        A.   Okay.

6        Q.   But before I do that I need to show you this.  Do

7  you see this statement here that says that on October 23rd,

8  2012 his attorney withdrew?

9        A.   Yes, sir.

10       Q.   You see October 23rd, 2012, his lawyer withdrew

11 because the Defendant had shown this Court that he has

12 sufficient resources and does not need the Court to continue

13 the appointment of counsel.  Mr. Alecio disclosed to the

14 Court, according to this document, "I don't need a court

15 appointed lawyer anymore," on October 23rd, right?

16       A.   Yes, sir.

17       Q.   And he next had a lawyer appointed to him -- I'm

18 sorry, not appointed, but entered the case on November 9th,

19 do you see that?

20       A.   Yes, sir.

21       Q.   So in October his lawyer withdraws -- his

22 court-appointed lawyer withdraws, and a few days later in

23 November he gets a new lawyer to enter the case, and in

24 between those dates is when the bond forfeiture was filed.

25            MR. GOLDMAN:  Objection; misstating the final

1  order, Your Honor.

2          THE COURT:  Okay, please --

3          MR. ADLER:  Do you want to see the order?

4          THE COURT:  -- calm down, Mr. Goldman.  If you

5  have a document you want introduced, let's wait for Mr.

6  Adler to finish --

7          MR. GOLDMAN:  Okay.

8          THE COURT:  -- and then introduce it, okay?

9          MR. GOLDMAN:  Okay.

10         MR. ADLER:  Let me show you the bond forfeiture if

11 I can find it.  Just hang on a second.

12     (Pause in proceedings.)

13     BY MR. ADLER:

14     Q.   It says on October 23rd his bond was forfeited, do

15 you see that?  Let me put it this way, do you see the cause

16 number we talked about earlier, 1825660?

17     A.   Yes.

18     Q.   When it has a dash A next to is that's --

19     A.   Yes.

20     Q.   -- the bond forfeiture case, do you understand?

21     A.   Yes, sir.

22     Q.   So if it doesn't have the "A," that's the actual

23 criminal case.  So this shows that on October 23rd his bond

24 was forfeited, right?

25     A.   Yes.

1      Q.   The forfeiture --

2           MR. GOLDMAN:  Your Honor, he's testifying.

3           THE WITNESS:  There's --

4           MR. ADLER:  Does it show that on the 23rd --

5           MR. GOLDMAN:  She doesn't know these things.

6           MR. ADLER:  -- a bond forfeiture was filed?

7           THE WITNESS:  Yes, which was different from this

8    number.

9      BY MR. ADLER:

10     Q.   I'm not asking you that.  Oh, it's different, you

11   think this is different?

12     A.   Well it has additional numbers than this one.

13     Q.   Oh, I'm sorry, 0101 is added to all cases in

14   Harris County; did you know that?

15     A.   No.

16     Q.   Were you aware of that?  I can show you.  So you

17   think -- you think it's just coincidence that the first

18   seven numbers of this case and that case are the same?

19     A.   No, I noticed the attached cases.

20     Q.   Yeah, as it related to this.  We don't need to

21   argue about that, right?

22     A.   Right.

23     Q.   So in October his lawyer withdraws and his bond is

24   forfeited and he hires a new lawyer in November and now I

25   want you to tell me if this bond is reinstated on

DINAH MORALES - RECROSS BY MR. ADLER

1   October 23rd also.  I'm going to pull up a different

2   document.

3        (Pause in the proceedings.)

4        BY MR. ADLER:

5        Q.   What date does it show his bail bond?

6        A.   October 23rd, 2012.

7        Q.   Okay, it's a possession of marijuana case?

8        A.   Yes.

9        Q.   It's the same 1825660?

10       A.   1825660.

11       Q.   So the sequence of events is his court -- he tells

12   the Court I don't need a court appointed lawyer and the

13   lawyer leaves the case, his bond is withdrawn, his bond is

14   reinstated -- his bond is forfeited, his bond is reinstated

15   the same day and he then hires a lawyer; is that correct?

16       A.   From what you say.

17       Q.   From what I say or from what the record shows?

18       A.   From what you say.  I wasn't keeping up with most

19   of it.

20       Q.   What would you like to see again so that --

21       A.   When it was --

22       Q.   Let me put it this way, does this -- what does

23   this document say at the top of the page in gigantic

24   letters?

25       A.   Bail bond.

1     Q.   What date is it?

2     A.   10/23/2012.

3     Q.   Okay, so was his bond reinstated on October, 23rd?

4     A.   Where does it stay "reinstated" there?

5     Q.   Well did he get a bail bond in the same case on

6  October 23rd?

7     A.   Yes.

8          MR. ADLER:  He did.

9          Nothing further, Your Honor.

10          THE COURT:  All right, Mr. Goldman?

11          MR. GOLDMAN:  If I may, Your Honor?

12          THE COURT:  Yes, please.

13          MR. GOLDMAN:  If I may approach the witness

14  similar to Mr. Adler, Your Honor?

15          THE COURT:  Of course.

16          MR. GOLDMAN:  Okay.

17   FURTHER REDIRECT EXAMINATION OF SPECIAL AGENT DINAH MORALES

18      BY MR. GOLDMAN:

19     Q.   Do you recognize -- could you please tell us and

20  the Court what this document is, it's still documents from

21  the same case?

22     A.   Yes, it's a final judgment of forfeiture.

23     Q.   Okay, and could you please state when it indicates

24  that the Defendant failed to appear in court?

25     A.   It's August 24th, 2012.

1     Q.    And when does it say that he was arrested on a new

2  case?

3     A.    October 12th, 2012.

4     Q.    And does it say if there was any good cause for

5  not appearing on August 24th, 2012?

6     A.    Correct, no.

7     Q.    And what was the date that this was signed?

8     A.    October 29th, 2012.

9     Q.    Now Counsel referred to him having appointed

10  counsel, not having appointed counsel, and then having

11  appointed counsel and all that, in October and November of

12  2012, you recall that, correct?

13     A.    Yes.

14     Q.    Did he fail to appear during that time period or

15  before then?

16     A.    He failed on October 24th.

17     Q.    And was his bail forfeited as a result of his not

18  appearing not in October or November, but when he failed to

19  appear August 24th, 2012?

20     A.    Yes, according to this.

21          MR. GOLDMAN:  All right no further questions, Your

22  Honor.

23          EXAMINATION OF SPECIAL AGENT DINAH MORALES

24          BY THE COURT:  Now tell me about this travel in

25  January, Ms. Morales.

1           THE WITNESS:  Yes, Your Honor, so Immigration

2   records indicated that on his entry back into the United

3   States on the 25th of this year -- January 25th of 2017, he

4   was attempting to enter through Pharr Port of Entry and the

5   Primary Inspector sent him to a Secondary check based on

6   multiple hits on NCIC and traveler hits.

7           THE COURT:  I'm sorry, and what?

8           THE WITNESS:  Traveler, so every person --

9           THE COURT:  Okay, all right, okay.

10          THE WITNESS:  Traveler hits.  Based on that, they

11  did a Secondary -- just checked his bags and his person and

12  then allowed him into the United States.

13          THE COURT:  Anything further, Mr. Adler?

14          MR. ADLER:  If I could?

15   FURTHER RECROSS-EXAMINATION OF SPECIAL AGENT DINAH MORALES

16     BY MR. ADLER:

17     Q.   Was he carrying anything illegal when he came into

18  the United States?

19     A.   No, sir.

20     Q.   Carrying anything illegal when he was going out of

21  the United States?

22     A.   Not -- no, sir.

23     Q.   Was he charged with anything when he left the

24  United States?

25     A.   No, sir.

1        Q.   Was he charged with anything when he came back

2   from the United States?

3        A.   Correct, no.

4             MR. ADLER:  Nothing further, Your Honor.

5             THE COURT:  I don't see these county records from

6   Pretrial, I don't understand what's going on.

7             MS. TROIANI:  Your Honor, it appears to be related

8   to the same --

9             THE COURT:  Is it a -- still the misdemeanor?

10            MS. TROIANI:  Yes.

11            THE COURT:  But did he pick up a new case while on

12  bond?

13            MS. TROIANI:  It's itemized as a different entry

14  and I believe it is -- it was a no bill.

15            MR. ADLER:  Again I can -- he was arrested and

16  charged with murder --

17            MS. TROIANI:  Murder.

18            THE COURT:  Oh, that was the murder.

19            MR. ADLER:  -- while he was on the misdemeanor

20  bond, but it was ultimately -- it was no billed three months

21  later, but yes he was arrested.  Mr. Goldman asked if he was

22  arrested while he was on bond, but he has no control over

23  when he's arrested or not arrested, but the case was no

24  billed.

25            THE COURT:  Okay.

 1              MR. ADLER:  And the misdemeanor case that we're

 2   talking about was dismissed a month after the bond was

 3   reinstated.

 4              THE COURT:  Is that what your records show, Ms. --

 5              MS. TROIANI:  Yes, Your Honor.

 6              THE COURT:  Okay.  All right, thank you,

 7   Ms. Morales.

 8              MS. MORALES:  Thank you, Your Honor.

 9         (Witness steps down.)

10              THE COURT:  All right, argument?

11              MR. GOLDMAN:  Yes, Your Honor, should I go first?

12              THE COURT:  Yes, it's your burden.

13              MR. GOLDMAN:  Yes, Your Honor, as the Court's

14   aware this is a presumption case and under the presumption

15   under 3142(e)(3), there's a presumption of two things.

16              THE COURT:  Okay, please don't shout in --

17              MR. GOLDMAN:  Okay.

18              THE COURT:  -- Ms. Jantowski's face.

19              MR. GOLDMAN:  Okay.

20              THE COURT:  That's really going to make her

21   nervous.  Go ahead and sit at Counsel's --

22              MR. GOLDMAN:  Okay.

23              THE COURT:  Well standing up.

24              MR. GOLDMAN:  Standing up.  I tend to speak too

25   quickly when I sit down.

1          THE COURT:  I understand that.

2          MR. GOLDMAN:  Okay.

3          THE COURT:  Thank you.

4          MR. GOLDMAN:  So, Your Honor, there are two things

5    that there's presumption to, one is that the person is a

6    flight risk and number two that there's a danger -- that

7    they are not a danger to the community or a danger to the

8    public.  So therefore, there has to be some sort of rebuttal

9    to that -- to both elements.

10         Here the Court has had no evidence, no evidence at

11   all, no evidence whatsoever regarding him not being a danger

12   to the community.  In fact, we've had no evidence presented

13   whatsoever on either issue, just a proffer and the proffer

14   was just that these folks will somehow post a bond for him.

15         What we have, Your Honor, is a presumption case

16   where it was established during testimony, although it got a

17   little mixed up during cross-examination, was the following:

18   This individual ABP was trafficked to the United States for

19   sex trafficking.  While she was here she tried to fight the

20   sex trafficking that she was brought here for, and one of

21   the enforcers was this Defendant who in fact dragged her by

22   the hair, dragged out to make her perform sex acts as part

23   of the brothel.

24         This is not in dispute.  Counsel may have problems

25   with this witness, but there's no evidence that she --

1          THE COURT:  Okay, just make your argument and

2    leave Mr. Adler out of it if you would.

3          MR. GOLDMAN:  Okay.  Well, there's been no

4    evidence presented that this is somehow incredible, in fact

5    it's established furthermore through the other individual,

6    the mother that Agent Morales also examined, that she can

7    corroborate a lot -- much of what was stated by ABP

8    regarding what happened.

9          Furthermore, NGL testified -- stated to Agent

10   Morales that she identified this Defendant as having one of

11   the women who was in the brothel.  As the Court is aware the

12   women in the brothel were victims of sex trafficking.  That

13   is part of this case, so therefore he is not just a mere

14   friend or acquaintance of the people involved in this

15   matter.  He actually was an enforcer for one individual and

16   then he actually had one of the girls, for lack of a better

17   term, for the other.

18          His dangerousness is further established by the

19   gun transaction.  All the audio recordings and video

20   recordings were of him.  The audio recordings were in his

21   phone.  And Mr. Adler may state that they don't know that

22   it's his phone, but they established that it was his phone

23   they used, indeed that's why we have a wire on this phone.

24   So therefore it was his phone, he made the arrangements, and

25   then he told them he was bringing somebody else down to do

1   the transaction, that was Mr. Gonzalez.

2          Mr. Gonzalez is not subject to a presumption case,

3   Mr. Gonzalez there was an identification issue, but I'll

4   leave that aside, but the fact is this individual arranged

5   all that, then he had a further conversation with a

6   confidential source indicating he had further guns to

7   provide.  Those guns types actually matched the types that

8   were recovered.

9          We then go to the actual recordings of him via the

10  wire intercepts, Your Honor, and we have four conversations

11  where he's engaging in talks of drug trafficking.  Now

12  Counsel may point out that he was not arrested or although

13  he was not arrested for that, Your Honor, that does show

14  that he was involved.  Being involved for detention purposes

15  and a danger to public safety is a lower threshold that

16  needed for an Indictment and obviously we can't just indict

17  somebody for a drug transaction based on those recordings,

18  but that is a matter this Court should take into

19  consideration in establishing danger to the community.

20          We further established that once the police

21  surveillance showed it came from the location of the

22  Carriage Way Apartments where surveillance shows he

23  frequented quite often.  While there, he ran up and he

24  locked and secured apartment 31B that belonged to Freddy

25  Montes, also known as King Mono to this Court, and then when

1    the arrest actually happened at that location they found a

2    bunch of guns and drugs at that location.  This all goes to

3    show that he's a danger to the community.

4         In addition, he has prior arrests.  I believe we

5    went through eight arrests in eight years, but six of those

6    were dismissed, but we have one felony conviction.  We have

7    unlawful carrying of a weapon recently, we have an assault

8    where he assaulted somebody, a misdemeanor felony, Your

9    Honor, that is a danger to public safety when somebody

10   assaults somebody, that's just how it is.

11        This is all recent events this is not events way

12   in the past.  This is the evidence before this Court, this

13   is a presumption case, and in addition, Your Honor, we do

14   have the recordings, his talking to JL about the Vladimir

15   Rubio individual where he begs Mr. Rubio to take the gun

16   charge for him.

17        Also, Your Honor, we do have the pretrial report

18   that this Court had.  This Court could consider it, although

19   the witnesses can't.  This Court notes that in there it

20   states that the only time he travelled outside the United

21   States when he had his interview with Pretrial was two years

22   ago to Cancun.  The records have established that that is

23   absolutely, patently false.

24        On January 25th, 2007, he came back to the United

25   States from Mexico.  That's less than two years ago, that's

1  not Cancun, and that's a very recent action and he quite

2  simply did not fess up to it.

3          So we have all these factors, Your Honor.

4  Regarding the most recent issue, bottom-line, Your Honor, is

5  that on August 24th he had to report to Court, he did not.

6  He forfeited his bond as a result.  The reason we bring this

7  up is that as this Court recalls, both witnesses were shown

8  the computer many times and they were asked the question so

9  he's never missed court.  That in fact is -- has been

10 established to not be true.  He did actually miss court

11 because the first time he's ever been indicted for a crime

12 of this severity, we talked about the murder that was just a

13 complaint that was no billed.  There was never any time that

14 he's actually faced a charge this serious before.

15         We've also heard from -- testimony from both Agent

16 Morales and Deputy Guerrero, Your Honor, indicating that

17 many of the Defendants that are not here, many of his

18 associates that he engaged in drug trafficking and sex

19 trafficking with have, in fact, fled and are still at large.

20         All of these factors, Your Honor, go to show that

21 he is both a danger and -- definitely a danger, also a

22 flight risk, and based on the presumption it has to be

23 rebutted.  I must emphasize again, Your Honor, there has

24 been absolutely no evidence, not one iota of evidence put

25 before this court, either in documents or in people, that --

1          THE COURT:  Well let's start with you have a

2   burden of clear and convincing evidence, so is that your

3   argument, you're finished?

4          MR. GOLDMAN:  Yes, Your Honor.

5          THE COURT:  All right, thank you.

6          Mr. Adler?

7          MR. ADLER:  Gosh, where to begin?  First of all,

8   yes, he's faced charges more serious than this, he was

9   charged with murder.  The maximum for that charge was 99

10  years, he showed up for Court every single time.  It was

11  dismissed, but he never once failed to show up on court for

12  that one.

13         I never asked if he had never missed court, what I

14  asked is has he been to court 47 times, which is the number

15  of times that I counted up.  I did not frankly include -- I

16  realized during the break there was a case that was

17  dismissed that I didn't even count the number of times, so

18  it was probably over 50 times that he appeared in court.

19         I would point out that at least on two of those

20  appearances he knew he was going to be sentenced.  They are

21  listed in the records and I would ask the Court to take

22  judicial notice of all his criminal history, including from

23  the Harris County Clerk's Office.  He knew he was going to

24  be locked up and he still showed up to court.  Yes, he

25  missed that one time apparently after his court-appointed

1  lawyer withdrew and before he had a new lawyer, but the bond

2  was reinstated right away.  I don't think that shows a risk

3  of flight, nor do I think this travel, whenever it occurred,

4  shows a risk.

5           I obviously disagree with the Government's

6  contention that there's been no rebuttal to the presumption.

7  I think the Government argues that in every case.  I don't

8  think they believe there's anything that can rebut a

9  presumption, but we have had in courtroom six -- I'm sorry,

10 seven witnesses whose testimony would be he's not violent,

11 he's not a danger to the community, and they are happy to

12 sign on a bond.

13          The real question here for the Court is:  Does the

14 Court have the capability to impose conditions of release

15 that reasonably assure the safety of the community and

16 reasonably assure his appearance in court?  I don't agree

17 with the Government's contention that you don't have that

18 capability.  I've been in this court many times, this court

19 has been very creative with fashioning a variety of

20 restrictions on individuals, and given his -- I've never had

21 a client who's been to court 47 times.  If he missed one, so

22 be it, but 47 times he's demonstrated on a murder case that

23 he's still coming to court.

24          As far as the danger to the community, there's

25 been no evidence other than the presumption, speaking of

1  presumptions, by the agents that it's Mr. Alecio who's on

2  these recordings.  I understand that's not an issue for the

3  Court to determine today, but they just think it was him on

4  the recordings.  They didn't have any other proof.  The

5  agent didn't even have the phone records to see if it

6  belonged to him.  I think that would've been a stronger

7  argument on their behalf.  I'm not here to make their

8  arguments.

9           So the weight of the evidence, he has faced a

10 charge more serious than this, he's been to court dozens and

11 dozens of times, we have people whose testimony would be

12 he's not violent, he's not dangerous, he will appear in

13 court.  They're all willing to sign on the bond.  I just

14 don't agree with the Government's contention that this Court

15 can't figure out a way to meet the requirements of the

16 statute and still release him on bond while this matter is

17 pending.

18           THE COURT:  Thank you.

19           Mr. Alecio, this is a presumption case.  The

20 statutory presumption as to risk of flight I think has been

21 rebutted.  I'm not so confident as to the clear and

22 convincing evidence of the danger to the community.  I have

23 to take into account not only the weight and circumstances

24 of the offense, but also your own personal history and

25 circumstances.  You have a very speckled criminal history,

1    there is violence in your criminal history.  I'm concerned

2    about the ongoing criminal activities that have been

3    testified to.  Yes, they weren't indicted, I grant you that,

4    but it's still some evidence of ongoing criminal activity.

5    That is what the presumption of danger is about:  Is there

6    going to be ongoing criminal activity?

7             I don't think there is any conditions of release

8    -- or are any conditions of release I should say -- that can

9    address that.  So for that reason I am going to order you

10   remanded to the custody of the U.S. Marshals pending trial.

11            You have the right to be kept separate from those

12   people who have been convicted of a crime and are waiting to

13   find out what their punishment is, and separate from those

14   people who have been convicted and punished for some crime

15   and have their cases on appeal.

16            You have a right to have private meetings with

17   your attorney.  Mr. Adler knows how to make arrangements for

18   those private meetings between now and the time of trial.

19   I'm frankly most upset about misrepresentations to Pretrial.

20   It's never, ever a good thing.

21            Any questions, Mr. Alecio?

22            DEFENDANT ALECIO:  No, ma'am.

23            THE COURT:  Is that a no?  Okay, and you already

24   did get your trial date, correct?

25            MR. ADLER:  I can get it offline or from

1  Mr. Randall's (phonetic) representative.

2          THE COURT:  Somebody said he's already been

3  arraigned.

4          MR. ADLER:  I think he was.

5          THE COURT:  He might not be but, Mr. Alecio, have

6  you already been arraigned?

7          DEFENDANT ALECIO:  Yes, ma'am.

8          THE COURT:  Did you already enter your plea of not

9  guilty?

10         DEFENDANT ALECIO:  Yes, ma'am.

11         THE COURT:  All right, okay.  Then if there's

12  nothing further you-all can be excused.

13         MR. GOLDMAN:  Thank you, Your Honor.

14         MR. ADLER:  Thank you, Your Honor.

15         THE COURT:  Thank you.

16      (Proceedings adjourned at 3:45 p.m.)

17                          * * * * *

18          *I certify that the foregoing is a correct*

19  *transcript to the best of my ability produced from the*

20  *electronic sound recording of the proceedings in the above-*

21  *entitled matter.*

22  */S/ MARY D. HENRY*

23  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*
    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337*

24  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
    *JTT TRANSCRIPT #57945*

25  *DATE:  JANUARY 14, 2017*